AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Kirill AFANASYEV and Deshaun LOGGINS | )  Case No.   3-23-mj-70039 MAG |
| | ) |
| | ) |
| | ) |
| *Defendants* | ) |

**FILED**

Jan 24 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____September 2, 2020_____ in the county of _____San Francisco_____ in the

_____Northern_____ District of _____California_____ , the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |

This criminal complaint is based on these facts:

See attached affidavit of Internal Revenue Service - Criminal Investigation Special Agent Anthony Ghio.

☑ Continued on the attached sheet.

Approved as to form: AUSA Waldinger

_____
*Complainant's signature*

Anthony Ghio  Special Agent, IRS-Criminal Investigation
*Printed name and title*

Sworn to before me by telephone.

Date:  January 23, 2023

_____
*Judge's signature*

City and state:      San Francisco, California          Hon. Thomas S. Hixson, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF ANTHONY GHIO
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Anthony Ghio, Special Agent of the Internal Revenue Service Criminal Investigation, being duly sworn, declare and state:

## I.       INTRODUCTION

1.       I make this affidavit in support of an application for a Criminal Complaint ("Complaint") against KIRILL AFANASYEV and DESHAUN LOGGINS.  As set forth below, there is probable cause to believe AFANASYEV and LOGGINS committed mail fraud in violation of Title 18, United States Code, Section 1341.

2.       I am employed as a Special Agent with the IRS Criminal Investigation (IRS-CI) assigned to the Oakland Field Office, Oakland, California office, and have been since 1998.  In the course of this employment, I have conducted or been involved in over 100 investigations of alleged criminal violations, which have included:  income tax evasion (Title 26, U.S.C. Section 7201); failure to file a tax return (Title 26, U.S.C. Section 7203); subscribing to false income tax returns (Title 26, U.S.C. Section 7206(1)); money laundering (Title 18, U.S.C. Sections 1956 and 1957); FBAR violations (Title 31, U.S.C. Section 5314); structuring cash transactions (Title 31, U.S.C. Section 5324(3)); and mail fraud (Title 18, U.S.C. Section 1341).  These investigations have focused on individuals deriving income from legal and illegal sources (theft, narcotics, or fraud).  Prior to becoming a Special Agent, I was a Revenue Agent in the Examination Division of the IRS for approximately three (3) years.  My duties as a Revenue Agent included conducting numerous civil audits into the federal tax liabilities of individuals, partnerships, and corporations.  Many of the civil audits that I conducted as a Revenue Agent focused on individuals who significantly underreported their business income.  I have participated in many search warrants of businesses and residences in connection with suspected tax evasion, money laundering, and currency structuring.  During my employment as a Special Agent, many of my investigations have focused on crimes that were facilitated using the Internet and e-mail.

3.       My professional and academic training includes five months at the Federal Law

Enforcement Training Center in Glynco, Georgia, which consisted of various courses including law, search warrants, interviewing techniques, and financial investigations; High Intensity Financial Crimes Area money laundering training; Revenue Agent tax training in individual, corporate, and partnership taxation; and I received a Bachelor's degree in Business Administration (Option in Accounting), which included a curriculum of accounting, taxation, and financial courses.  I have been involved in numerous investigations that resulted in the prosecution of individuals for tax evasion, money laundering, and currency structuring.  In addition, I have interviewed these individuals and their associates as to various methods used by them to evade their income tax, structure currency transactions to avoid detection, and launder illicit proceeds.  These methods include, among others, the use of aliases, nominees, and businesses as "fronts" in an attempt to disguise income and/or legitimize illicit proceeds, and the use of offshore financial institutions, cash purchases (in amounts less than $10,000), the "structuring" purchase of numerous monetary instruments with cash (in amounts less than $3,000), "structuring" currency deposits and withdrawals to/from bank accounts (in amounts less than $10,000).

4.      I have knowledge of the facts set forth in this affidavit as a result of my personal participation in the investigation, my conversations with other State and Federal law enforcement officials involved in the investigation, and my review of records obtained during the investigation.  As part of the investigation, I have participated in witness interviews; subpoenaed and requested information and records from witnesses and businesses and reviewed that information and those records; reviewed bank records; reviewed insurance claim files; reviewed Department of Motor Vehicles records; reviewed reports; and reviewed vehicle purchase records.

5.      As described in more detail below, evidence developed during this investigation shows that KIRILL AFANASYEV devised and engaged in a scheme and artifice to defraud automobile insurance companies beginning no later than 2015 and continuing to at least 2020. AFANASYEV executed this scheme by arranging for (1) the purchase of wrecked or damaged vehicles in nominee names, (2) the purchase of insurance policies in those nominee names, in

2

which the vehicles were insured as if they were in an undamaged condition when, in truth, no substantial repairs had been made to the wrecked or damaged vehicles after they were purchased, and (3) the submission of insurance claims containing material false or misleading information to the insurance companies.  The insurance companies then paid the nominee owners the insured value of the vehicles (which was far higher than the vehicles' true value at the time they were insured), and issued payments to the nominee owners, who then passed on most of the proceeds to AFANASYEV.  The evidence shows that DESHAUN LOGGINS served as a nominee owner with respect to two of these vehicles, and did so as recently as 2020.  As set forth below, there is probable cause to believe that there were mailings made through the United States Postal Service ("USPS") or through private or commercial interstate carriers that were in furtherance of, or incident to an essential part of, the scheme.  Specifically, for purposes of this affidavit, there is probable cause to believe that AFANASYEV and LOGGINS committed mail fraud on or about September 2, 2020, when Liberty Mutual Insurance Company mailed a check in the amount of $56,778.14 through the USPS to LOGGINS, the owner of a 2020 Maserati Levante.

## II.    RELEVANT LAW

6.      Title 18, United States Code, Section 1341 prohibits mail fraud.  The elements of that offense are as follows:

a.      First, the defendant knowingly participated in, or devised, a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or concealed facts;

b.      Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

c.      Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

d.      Fourth, the defendant used, or caused to be used, the mails (including the United States Postal Service or a private or commercial interstate carrier) to carry out or

attempt to carry out an essential part of the scheme.

**III.    FACTS ESTABLISHING PROBABLE CAUSE**

7.      As a  result of my participation in this investigation, I have learned substantial information regarding insurance claims that were submitted with respect to numerous vehicles, including a 2015 Jeep Grand Cherokee, a 2016 BMW 340, and a 2020 Maserati Levante.  As set forth in more detail below, the facts regarding the purchase of these three vehicles, the insurance claims that were later submitted regarding these vehicles, and the subsequent insurance payouts (and disposition of those payouts) establish probable cause to believe that AFANASYEV and LOGGINS have committed the crime of mail fraud.  For purpose of this criminal complaint, I submit that the evidence shows that AFANASYEV and LOGGINS committed mail fraud on or about September 2, 2020, when Liberty Mutual Insurance Company mailed a check in the amount of $56,778.14 through the USPS to LOGGINS with respect to a fraudulent insurance claim that he had submitted with respect to a 2020 Maserati Levante.

8.      The following sections and paragraphs set forth facts regarding the three vehicles listed above in turn (*i.e.*, 2015 Jeep, 2016 BMW, and 2020 Maserati).  Because the evidence shows that AFASAFYEV obtained these three vehicles from Manheim Auto Auction through the automobile dealerships identified here as "Auto Dealership One" and "Auto Dealership Two," this affidavit also sets forth facts regarding Manheim Auto Auction and AFANASYEV's relationship to Auto Dealership One and Auto Dealership Two.  In addition, this affidavit sets forth specific facts about LOGGINS, including his communications in 2020 with AFANASYEV.

**Manheim Auto Auction, Auto Dealership One, and Auto Dealership Two**

9.      Manheim, Inc., which is also known as "Manheim Auto Auction" or simply as "Manheim," is a wholesale auto auction company, headquartered in Atlanta, Georgia, with numerous locations around the United States and in several international locations.)

10.     Auto Dealership One is a California corporation.

11.     Auto Dealership Two is also a California corporation.  (Based on my review of documentation on the California Secretary of State's website, it appears that Auto Dealership

4

Two's status was suspended by the Secretary of State in 2021.)

12.     Based on the investigation, both Auto Dealership One and Auto Dealership Two are engaged in the business of used car sales in the Northern District of California.

13.     AFANASYEV purchased vehicles from a Manheim location in Southern California using Auto Dealership One's and Auto Dealership Two's wholesale accounts with Manheim.  Manheim's records show that AFANASYEV has had roles as a representative for numerous car dealerships.  Manheim provided information showing that, on March 10, 2020, AFANASYEV was a registered representative with an active role at Auto Dealership One and Auto Dealership Two.

### AFANASYEV's Relationship to Auto Dealership One

14.     As set forth in more detail below, shortly before the insurance claim described herein, the 2015 Jeep Grand Cherokee was purchased by Auto Dealership One from Manheim.

15.     On May 10, 2022, the owner of Auto Dealership One (hereafter Owner One) was interviewed.  Owner One identified a cropped driver's license photo of KIRILL AFANASYEV as "KIRILL."  Owner One was asked to name the "biggest" in the context of insurance frauds, and Owner One named KIRILL.  Owner One stated that AFANASYEV paid him $300.00 per car (*i.e.*, this was Owner One's profit on each car for allowing AFANASYEV to purchase cars using Auto Dealership One's wholesale account with Manheim).  (On July 20, 2022, Owner One similarly stated that he generally only earned between $300 and $400 on vehicles that KIRILL AFANASYEV purchased at Manheim.)

16.     Owner One stated that AFANASYEV and Individual A are associates.  Owner One helps AFANASYEV and Individual A buy and sell cars.

17.     Owner One will not sell frame-damaged cars to the public.  Owner One stated that he does not buy "TRA" vehicles[1] and that he has never bought one in his life, but that AFANASYEV buys them.  Owner One stated that KIRILL AFANASYEV used Owner One's

---

[1]  "TRA" stands for "Total Resource Auction."  TRA is an acronym on Manheim paperwork related to prior rental fleet vehicles with heavy accident damage.

account with Manheim Auto Auctions for many years to buy cars. Owner One stated that he lets AFANASYEV use his name on Owner One's Manheim account. At some point, Owner One became aware that AFANASYEV used his Manheim account to purchase damaged cars that AFANASYEV used in an insurance fraud scheme. Owner One stated that in the beginning he did not know that AFANASYEV was committing insurance fraud, but he eventually knew. AFANASYEV has Owner One's bank account number and is able to deposit money he owes Owner One to Owner One's bank account. Owner One stated that AFANASYEV generally pays him after the purchase of a vehicle. To do so, AFANASYEV deposits money into Owner One's account within a couple of days of the purchase, but sometimes it takes much longer. Owner One stated that AFANASYEV also buys normal (presumably meaning generally undamaged and drivable) expensive cars using Owner One's account.

18.　　As noted above, Owner One stated that AFANASYEV paid Owner One $300 per car to use the Owner One's Manheim account to purchase cars. Owner One also stated that, when he sold AFANASYEV an undamaged BMW, he charged AFANASYEV $1,000.00. Owner One stated that he does not buy the cars for AFANASYEV, meaning that Owner One does not go online for AFANASYEV; AFANASYEV goes online and makes his own purchases. Owner One stated that he does not generally purchase damaged vehicles from Manheim, which makes it easy for him to identify vehicles that were purchased by KIRILL AFANASYEV.

19.　　Owner One opened Auto Dealership One in 2010 and stated that AFANASYEV has been purchasing vehicles using Owner One's account for a long time. When asked when AFANASYEV began purchasing wrecked cars, Owner One estimated five or six years ago.

20.　　Owner One described what he knew or surmised about how AFANASYEV performed insurance fraud. Owner One stated that he did not know exactly how AFANASYEV does it, since he has not been part of one of AFANASYEV's frauds. Owner One stated that AFANASYEV buys the wrecked car and brings the "buyer" to Owner One. Owner One does the paperwork, and they find the person that will insure the car in their name. The car gets in an accident. They then call the insurance company and collect money from the insurance. Owner

6

One does not employ AFANASYEV at Auto Dealership One.

21.     On May 10, 2022, Owner One also stated that he knows the owner of Auto Dealership Two (Owner Two) and he was aware of AFANASYEV's association with Auto Dealership Two.  Owner One stated that Owner Two "screwed" AFANASYEV over on the purchase of Auto Dealership Two.  Owner One stated that Owner Two sold AFANASYEV the store (meaning Auto Dealership Two), and that Owner One had helped AFANASYEV negotiate that deal with Owner Two.  However, Owner One stated that Owner Two never transferred the ownership of Auto Dealership Two over to AFANASYEV's name.  Owner One stated that AFANASEV paid Owner Two.

### Vehicle - 2015 Jeep Grand Cherokee

22.     On or about July 20, 2022, Owner One provided investigators with numerous "dealer jackets" (*i.e.*, files) related to vehicles purchased and sold through Auto Dealership One, including files regarding vehicles believed to have been purchased by AFANASYEV.  One of those files related to a 2015 Jeep Grand Cherokee.  Investigators' review of that file, along with the review of Manheim's records regarding the sale of this vehicle to Auto Dealership One shows the following:

23.     On July 22, 2015, Manheim Auto Auctions sold that 2015 Jeep Grand Cherokee to Auto Dealership One.  The 2015 Jeep Grand Cherokee is identified with Vehicle Identification Number (or "VIN") 1C4RJFBG8FC865324, was black in color, had 1,897 miles on the odometer when purchased, and was purchased for $14,000 from Manheim with other fees of $385.  Auto Dealership One's records indicate that the vehicle was purchased for $14,485.00.  Manheim's records show that the seller of the 2015 Jeep Grand Cherokee was Ean Holdings, which is also known as Enterprise Holdings.[2]

24.     As noted above, Owner One stated that he does not generally purchase damaged vehicles from Manheim and that Owner One generally only earned between $300 and $400 on

---

[2]  Based on my training and experience, I know that Enterprise is a company that rents vehicles under various brand names, including Enterprise, Alamo, and National.

vehicles that KIRILL AFANASYEV purchased at Manheim using the Auto Dealership One account.  The documentation in the Grand Cherokee file that Owner One provided shows that Owner One's profit on this vehicle was only $340.00.

25.    Owner One also provided the records he had for this vehicle and the California Department of Motor Vehicles (DMV) sale to the individual who purchased the vehicle from Auto Dealership One, *i.e.*, the individual identified herein as "Buyer One."  The Manheim Condition Report graded the vehicle with a total score of "2" out of 5.  (On the Manheim Condition Report, "0" is the lowest grade, and "5" is the highest grade.  Pre-sale pictures of the 2015 Jeep Grand Cherokee were no longer available from Manheim Auto Auctions, nor have investigators to date found documentation describing the damage to the vehicle in detail at the time of the sale from Manheim to Auto Dealership One.)

26.    Auto Dealership One's records show that, on November 11, 2015, Buyer One purchased the 2015 Jeep Grand Cherokee from Auto Dealership One for $14,745.00.  DMV documents show the Grand Cherokee had a Purchase/Application transaction to registered owner Buyer One at Buyer One's address on November 11, 2015.

27.    Records provided by 21st Century Insurance Company (21st Century) show that, on September 12, 2015, Buyer One insured the 2015 Jeep Grand Cherokee with 21st Century.[3] On December 2, 2015, a 21st Century claim was filed by Buyer One, with a claimed accident date of November 30, 2015.  The initial inspection by 21st Century stated that the damages to the vehicle were the following:  FT [front] bumper assy [assembly] broken, RT [right] fender and

---

[3] Notably, the insurance policy was taken out before Auto Dealership One purchased the vehicle from Manheim and before Auto Dealership One's sale of the vehicle to Buyer One. Based on my training and experience, knowledge of this investigation, and information obtained generally from insurance companies, I know that it is possible for individuals to insure vehicles even if the vehicles are not titled in their names.  Based on the same factors, I know that insurance companies often "red flag" insurance claims that are made within the first month or first several months of the beginning of a policy.  I submit that, in this case, AFANASYEV arranged to have insurance purchased in September 2015 in an attempt to maximize the amount of time that would have lapsed before Buyer One's insurance claim was submitted, in the hopes that the claim would not be red-flagged.

hood heavily bent and buckled, RT door shell warped and will not close, all other exterior panels scratched, lift gate heavily dented and will not open, and rear bumper assembly broken.

28.     21st Century sent Buyer One a FedEx return shipping label, generated on December 11, 2015, which shipping label bore the FedEx tracking number 7950 9675 8710. This shipping label was provided to Buyer One by 21st Century so that Buyer One could return documents to 21st Century as part of the claim process.  FedEx verified that the shipment of the return shipping label from Buyer One to 21st Century was picked up on December 16, 2015, and that the shipment moved through FedEx's "Express" network.  I know based on my training and experience in other investigations that FedEx is a private and commercial interstate carrier.

29.      I have reviewed photographs of the damage to the 2015 Jeep Grand Cherokee in the 21st Century file.  The photos show that the 2015 Jeep Grand Cherokee had heavy right front end damage, a broken rear window, a damaged left rear bumper, and damage along the right side of the vehicle.  The photos also show that the airbags inside of the vehicle had deployed.

30.     21st Century ultimately granted the claim.  On December 17, 2015, a $39,428.74 digital check was issued by 21st Century and paid to the order of Buyer One.  On December 21, 2015, that digital check was deposited into Buyer One's San Francisco Federal Credit Union (SFFCU) account numbered ending 0675, via an Automated Clearing House (ACH) electronic deposit.  Then, on December 22, 2015, an SFFCU Official Check was issued, paid to the order of KIRILL AFANASYEV from Buyer One, in the amount of $34,400.00.  The memo line of that check stated "FULL CAR PAYMENT."  The investigation has shown that that Official Check was deposited into KIRILL AFANASYEV's Wells Fargo account numbered ending 2399.

31.     On May 26, 2022, Buyer One was interviewed by the FBI and IRS.  Buyer One admitted to knowing KIRILL AFANASYEV, whom he had met in 2014 or 2015 at a bar in San Francisco.  Buyer One identified AFANASYEV's photo as being "KIRILL."  Buyer One stated that he knew KIRILL to be involved in the car business and in buying vehicles at auto auctions.

32.     Buyer One stated that KIRILL approached him in 2015 about a business deal to buy a vehicle, which KIRILL would then sell and return a profit to Buyer One.  Buyer One

provided KIRILL with a copy of his California Driver's License.  Buyer One began to receive auto insurance documents in the mail at his home.  Buyer One then received a payment from 21st Century Insurance.  Buyer One never paid insurance on the vehicle.  KIRILL drove Buyer One to the San Francisco Federal Credit Union, where Buyer One withdrew funds from his account and gave KIRILL a cashier's check.  (As noted above, investigators have determined that the cashier's check that Buyer One obtained was in the amount of $34,400.00.  Therefore, it appears that Buyer One kept approximately $5,028.74 of the insurance proceeds.)

33.    During the interview, Buyer One made the following statements:

- "I never actually owned that Jeep."

- "I've actually never seen this vehicle, I've never used it, or driven this car."

- "I've never signed or seen any documentation in order to obtain liability of that vehicle."

- "I found out later, after the fact, that he had put the insurance under my name as well."

34.    I believe, based on the graded condition of the vehicle by Manheim in or about November 2015 (*i.e.*, a "2" on a scale of 0 to 5), the fact that Manheim sold the vehicle for only about $14,000 (indicating severe damage), and the damage documented regarding Buyer One's December 2015 insurance claim, that this vehicle was in the same condition at the time it was insured in September 2015 and at the time of the insurance claim in early December 2015 as when it was sold from Manheim Auto Auctions in November 2015 and that no accident involving the vehicle occurred after the Manheim Auto Auction sale to Auto Dealership One. The insurance claim with 21st Century therefore appears to be insurance fraud.  As noted above, at least one mailing was caused in furtherance of the fraud scheme (*i.e.*, Buyer One's sending of documents as part of the claim process to 21st Century through FedEx's "Express" Network).

**Relationship between AFANASYEV, Auto Dealership Two, and Owner Two**

35.    As set forth in more detail below, shortly before the insurance claims at issue in this affidavit, the 2016 BMW 340 and 2020 Maserati Levante were purchased by Auto Dealership Two from Manheim.

36.    Investigators interviewed the owner of Auto Dealership Two (Owner Two) on

July 24, 2020.  Owner Two stated that he met KIRILL AFANASYEV in 2016.  They knew each other for approximately two years before Owner Two decided to bring AFANASYEV in as a partner in his business, Auto Dealership Two.  Owner Two and AFANASYEV were in business as partners of Auto Dealership Two for approximately three years.  Owner Two stated that AFANASYEV worked the retail side of their business, and Owner Two worked the wholesale side of the business.  Owner Two stated that AFANASYEV had physical access to the auto auctions to buy vehicles for the dealership and pick them up, and AFANASYEV used Owner Two's login to buy the vehicles.  Owner Two stated that the plan was for AFANASYEV to buy Auto Dealership Two from Owner Two for $45,000.  This deal did not include the inventory of vehicles owned by Auto Dealership Two.  Owner Two stated that he put AFANASYEV on the Auto Dealership Two credit card at Wells Fargo (account numbered ending 4900).  Owner Two stated that he is listed as the guarantor on AFANASYEV's credit card.  Owner Two stated that KIRILL used cash to buy the vehicles he was purchasing for the dealership.

### Vehicle – 2016 BMW 340

37.  On April 11, 2017, Manheim Auto Auction records show that Auto Dealership Two purchased a 2016 BMW 340 from Manheim's Southern California location at 10700 Beech Ave., Fontana, California.  That BMW 340 is identified with VIN WBA8B3G55GNT92273, was imperial blue in color, had 1,266 miles on the odometer when purchased, and was purchased for $12,000.00, with a total purchase amount of $12,480.00.  The seller of the 2016 BMW 340 was Financial Services Remarketing.  According to Manheim records, the listed agent of record for the purchaser (Auto Dealership Two) is KIRILL AFANASYEV.

38.  The Manheim Auction Condition Report graded the vehicle as "Rough," and the pictures of the BMW 340 provided by Manheim show that it was in an accident and there was heavy damage to the front end.  Based on the photographs I have reviewed, this vehicle appears to have hit a pole in the middle of the front end of the vehicle.  The left rear door showed accident damage, as well.  The driver's steering wheel airbag was deployed, as were the driver's side-curtain airbags.  One of the two iconic BMW "kidney" grills is located on the front seat of

the vehicle.  The Manheim Auction Condition Report listed the vehicle as being undriveable with a non-functioning engine.

39.     Based on records obtained from Liberty Mutual Insurance Company (Liberty Mutual), an individual named Deshaun LOGGINS insured the BMW 340 with Liberty Mutual on May 20, 2017.  The records from the Department of Motor Vehicles indicate that LOGGINS purchased the BMW 340 from Auto Dealership Two for $12,680 on June 28, 2017.  Information supplied by Liberty Mutual shows the total annual premium for this policy was $2,713.75, with a down payment amount of $227.74, shown on an insurance application dated May 19, 2017.  The records show that the insurance policy had an effective date of May 20, 2017.  A review of the statement for the period ending June 12, 2017 for Deshaun LOGGINS's Wells Fargo Bank account numbered ending 9053 shows a May 22, 2017 transaction in the amount of $227.74. The description for this transaction says it was authorized on May 20, 2017 to Liberty Mutual.

40.     On July 23, 2017, a Liberty Mutual claim was filed under claimant Deshaun LOGGINS's name, with a claimed accident date of July 22, 2017.

41.     Liberty Mutual records reflect that the company issued check number 41775577, dated August 16, 2017, in the amount of $54,139.47 for LOGGINS's BMW 340 claim.  The records reflect that the check was sent to Deshaun LOGGINS at a Jamestown Avenue address in San Francisco, California.

42.     Liberty Mutual provided information about the claim, correspondence, payments, etc. related to this vehicle.  Liberty Mutual representatives verified that check number 41775577, issued on August 16, 2017, in the amount of $54,139.47 was sent on August 17, 2017, via United Parcel Service (hereafter UPS) tracking number 1Z7557800194565167 to Deshaun LOGGINS at the Jamestown Avenue address in San Francisco.  I know based on my training and experience in other investigations that UPS is a private and commercial interstate carrier.

43.     Based on records obtained from Wells Fargo, the $54,139.47 Liberty Mutual check was deposited into Deshaun LOGGINS's Wells Fargo 9053 account on August 25, 2017. The Wells Fargo records show that LOGGINS then made a $20,000 withdrawal from that

account on August 29, 2017, followed by withdrawals of $20,000, $9,139.00, and $4,100 on August 30, 2017.

44.     Based on other records obtained from Wells Fargo, I have determined that, on the same date that $9,139.00 was withdrawn from LOGGINS's Wells Fargo account (*i.e.*, August 30, 2017), a deposit of $9,139.00 was made into a Wells Fargo account numbered ending 5230 in the name of KIRILL AFANASYEV and the name of a person believed to be AFANASYEV's mother.   Those records also reflect a separate $35,000 cash deposit into the same 5230 account on August 30, 2017.

45.     The Liberty Mutual claim file for the 2016 BMW 340 indicates that Deshaun LOGGINS advised Liberty Mutual that he was driving the vehicle and swerved to avoid an accident with another vehicle, and then impacted a tree.   The collision was purported to have happened in Brisbane, California.

46.     I observed the photographs of the 2017 BMW 340 that were taken by a Liberty Mutual employee on August 7, 2017 at an auto body shop in San Francisco, California and on August 4, 2017 at a tow yard.   I observed that the 2016 BMW 340 had heavy front-end damage that appears to have been caused by hitting a large cylindrical object.   I observed that both of the iconic BMW "kidney" grills were missing from the front bumper of the vehicle.   I observed that the driver's steering wheel airbag and side-curtain airbag were deployed.   Finally, I observed the left rear passenger's door had significant accident damage.   The damage appears to be largely identical to the damage documented by Manheim on March 27, 2017, prior to Auto Dealership Two's purchase of the vehicle on April 11, 2017, and is consistent with what I observed in the photographs I reviewed from Manheim.

47.     Based on the graded condition of the vehicle by Manheim on or about April 11, 2017 ("Rough"), the fact that Manheim sold the vehicle for only about $12,000 (indicating severe damage), and the damaged documented by Liberty Mutual in the photographs referenced above, I submit that it is apparent that the 2016 BMW 340 was purchased damaged, never repaired, and insured, and that an insurance claim was then filed claiming damage on July 22,

13

2017, for an accident that never occurred.  Therefore, this claim appears to be insurance fraud.
As noted above, at least one mailing was caused in furtherance of the fraud scheme (*i.e.*, Liberty
Mutual's sending of the check to LOGGINS through UPS).

### Vehicle - 2020 Maserati Levante

48.     Based on records obtained from Manheim Auto Auctions, on February 18, 2020,
Auto Dealership Two purchased a 2020 Maserati Levante from Manheim's Southern California
location in Fontana.  The 2020 Maserati Levante is identified with VIN ZN661YUA3LX344912,
was white in color, had 3,771 miles on the odometer when purchased, and was purchased for
$30,000, with a total purchase amount of $30,805.  The seller of the 2020 Maserati Levante
listed in Manheim's records as 'ENTERPRISE VEHICLE
EXCHANGE/TRA/RENTAL/TULSA.'.  (Because the seller's name includes "Enterprise," and
based on my training and experience and knowledge of this investigation and the automobile
auction business, I believe that the vehicle had been part of a rental fleet.)  According to
Manheim records, the listed agent of record for the purchaser (Auto Dealership Two) was
Individual A.  As set forth above, based on statements made by Owner One, Individual A is a
known associate of KIRILL AFANASYEV.

49.     The Manheim Auction Condition Report graded the vehicle as "Rough," and the
pictures of the 2020 Maserati Levante provided by Manheim show that it had been in an accident
and that there was heavy damage to the front end.  The vehicle was listed as being undriveable
with a non-functioning engine.  The front end of the 2020 Maserati Levante had significant
damage to the hood (including a hole in the hood), the front bumper was missing, the inner
structure to the front bumper was cracked in the middle, and the driver's side fender liner
appeared to have been missing.  The Manheim photographs also show that the Maserati bore
California license plate 8MAC040.

50.     On March 5, 2020, Deshaun LOGGINS (*i.e.*, the same individual associated with
the BMW insurance claim discussed above) insured the 2020 Maserati Levante with Liberty
Mutual.  California Department of Motor Vehicle records show that on March 9, 2020, Deshaun

14

LOGGINS purchased the Maserati Levante from Auto Dealership Two for $30,999. (Note that this amount is slightly different than what is reflected in Manheim's records.) Information supplied by Liberty Mutual shows the total annual premium for this policy was $3,814.75. The effective date for the policy is shown as March 5, 2020. The records provided by Liberty Mutual show that the quote for the policy was worked up on March 4, 2020.

51.     A review of Deshaun LOGGINS's March 10, 2020 Citibank bank statement for the account numbered ending 4036 shows two debit card purchases for Liberty Mutual on March 6, 2020. These two charges show a March 4, 2020 date, which suggests they were charged on March 4, 2020 and deducted from the Citibank account on March 6, 2020. One charge is in the amount of $81.50 and the other charge is in the amount of $1,908.25. Based on the information provided by Liberty Mutual regarding the policy for the 2020 Maserati Levante, I believe that these two charges were payments toward the annual policy premium of $3,814.75.

52.     On March 11, 2020, FBI Task Force Officers (TFOs) Hackard and Kane conducted surveillance at the Auto Dealership Two car lot in San Mateo, California. On that date, at 1535 hours, TFO Kane and TFO Hackard observed a damaged Maserati Levante, bearing California license plate 8MAC040, parked in an abandoned lot next door to Auto Dealership Two and took photographs of the vehicle. Based on the above, I believe that the Maserati Levante observed by TFOs Hackard and Kane was the same vehicle purchased by Auto Dealership Two at Manheim in February 2020. The vehicle still showed the exact same damage as the damage seen in the Manheim Auto Auction Condition Report. TFOs Hackard and Kane observed that both license plates had "PFR"[4] registrations on them which they know to be consistent with prior rental vehicles. TFOs Hackard and Kane observed a white male exit the Auto Dealership Two office and get into a white Mercedes. This person appeared to both TFOs Hackard and Kane to be KIRILL AFANASYEV based on photographs they have seen of him.

53.     On August 10, 2020, a Liberty Mutual claim was filed under claimant Deshaun

---

[4] "PFR" is an acronym used by DMV for California Permanent Fleet vehicles, which would include rental cars.

LOGGINS'S name, with a claimed accident date of August 9, 2020.  I reviewed the Liberty Mutual claim file for the 2020 Maserati Levante.  I observed the following from the photographs of the vehicle taken on August 13, 2020 by Liberty Mutual: the front end of the 2020 Maserati Levante had significant damage to the hood (including a hole in the hood), the front bumper was missing, the inner structure to the front bumper was cracked in the middle, and the driver's side fender liner appears to have been missing.  Based on my observations, the damage appears to be identical to the damage documented by Manheim on February 17, 2020, prior to Auto Dealership Two's purchase of the vehicle on February 18, 2020.

54.     In reviewing the Liberty Mutual claim file for the Maserati Levante, I observed a summary of an August 11, 2020 telephone conversation between Deshaun LOGGINS and an employee of Liberty Mutual.  In this conversation, LOGGINS states that, on August 9, 2020, at 11:00 pm he was driving on Sunset Blvd. at Merced Avenue in San Francisco, California.  LOGGINS stated that he was driving south in the left lane on Sunset Blvd. when he dropped his phone in the cupholder of the vehicle.  LOGGINS explained that he reached down to pick up his phone, and, when he looked up, he saw lights and a vehicle coming north towards him that was making a left turn.  LOGGINS stated that he swerved right to avoid the vehicle and hit a sign and a garbage can.  He said he did not get any information for the other vehicle.

55.     Liberty Mutual records reflect that the company issued check number 50792715, dated September 2, 2020, in the amount of $56,778.14 for LOGGINS's Maserati Levante claim.  The records reflect that the check was sent to Deshaun LOGGINS at the Jamestown Avenue address in San Francisco, California.  Liberty Mutual's records also reflect that the company also issued check number 50816304, dated September 4, 2020, in the amount of $17,500 for LOGGINS's Maserati Levante claim, which check was sent to Deshaun LOGGINS at the same Jamestown Avenue address.

56.     Citibank records show that, on September 10, 2020, at 2158 hours, a $17,500 Liberty Mutual check was deposited into Deshaun LOGGINS's Citibank account numbered ending 4036 via an ATM deposit at a Citibank ATM, located at 495 Hickey Boulevard, Daly

City, CA.  Citibank records also show that, on September 17, 2020, at 2346 hours, a $56,778.14 Liberty Mutual check was deposited into Deshaun LOGGINS's 4036 Citibank account via an ATM deposit at a Citibank ATM, located at 495 Hickey Boulevard, Daly City, CA.

57.     On September 25, 2020, at 1545 hours, a $63,000 cashier's check withdrawal was made from Deshaun LOGGINS's 4036 Citibank account.  Bank records obtained from Wells Fargo show that, on September 25, 2020, that $63,000 cashier's check was deposited into a Wells Fargo account numbered ending 5416.  This account is held in the name of the woman that is believed to be AFANASYEV's mother.

58.     Liberty Mutual provided information about the claim, correspondence, payments, etc. related to this vehicle.  Liberty verified that check number 50792715, in the amount of $56,778.14 was paid on September 2, 2020 from the Maserati Levante claim and mailed through the USPS to Deshaun LOGGINS at a Jamestown Avenue address in San Francisco, California.  On September 4, 2020, check 50816304, in the amount of $17,500 was also paid from the Maserati Levante claim and mailed through the USPS to Deshaun LOGGINS at the same Jamestown Avenue address in San Francisco.

59.     Based on my review of the photographs from the Manheim file, the photographs taken by TFOs Hackard and Kane, the other information in the Manheim and Liberty Mutual files, and TFOs Hackard and Kane's observations of the Maserati and AFANASYEV in March 2020, I submit that there is probable cause to believe that the 2020 Maserati Levante was purchased damaged, never repaired, and insured, and that a claim was then filed claiming damage on August 9, 2020 for an accident that never occurred.  Therefore, this claim appears to be insurance fraud.  As noted above, at least two mailings were caused in furtherance of the fraud scheme (*i.e.*, Liberty Mutual's mailing of two separate checks through the USPS).  This affidavit seeks a probable cause finding from the Court that AFANSYEV committed mail fraud by virtue of the mailing through the USPS of check number 50792715, in the amount of $56,778.14, on or after September 2, 2020.

**Additional Evidence Regarding LOGGINS's Participation in the Scheme to Defraud**

60.     As noted above, bank records from Wells Fargo and Citibank show that the insurance policy payments were made out of accounts held in LOGGINS's name for the 2016 BMW 340 and the 2020 Maserati Levante, in 2017 and 2020, respectively.  I submit that additional evidence also indicates that LOGGINS knowingly and with intent to defraud participated in a scheme to defraud insurance companies with AFANASYEV, as set forth in more detail below.

***2016 BMW 340***

61.     With respect to the claim submitted to Liberty Mutual regarding the 2016 BMW 340, the Liberty Mutual claim file showed DocuSign information for Deshawn [sic] LOGGINS, using the email address "dshawsf415@gmail.com" on August 15, 2017.  No documentation received during this investigation for LOGGINS, other than this claim file, shows him using this e-mail address.  An online search of an open-source database for that e-mail address returned no subscriber information, suggesting that this e-mail address was not used by anyone as a contact e-mail address to any reporting entities that report to that open-source database.

62.     The Liberty Mutual claim file for the 2016 BMW 340 also contains a page from West Wind Automotive (an auto body shop) listing contact information for Deshaun LOGGINS, including a telephone number with a "628" area code.  That telephone number also listed within the Liberty Mutual estimate of record on August 4, 2017, along with the previously mentioned e-mail address of dshawsf415@gmail.com.  The 628 telephone number also is listed in the Liberty Mutual claims file in a contacts section.  An open-source database search of that telephone number returned no subscriber information, suggesting that this telephone number was not used by anyone as a contact telephone number to any reporting entities that report to open-source database.  No documentation received during this investigation for LOGGINS, other than this claim file shows him using this telephone number.

63.     As noted above, DMV records indicate that LOGGINS purchased the BMW 340 from Auto Dealership Two for $12,680 on June 28, 2017.  However, I have reviewed records

from LOGGINS's Wells Fargo Bank account numbered ending 9053, including for the April through July 2017 time period, and I did not observe any expenditures of this amount.  I did observe a $6,800 deposit on May 4, 2017, followed by a withdrawal in the same amount on May 5, 2017.  I identified no other large deposits or withdrawals through July 13, 2017 that would be big enough for the BMW purchase amount of $12,680.  Accordingly, at least based on a review of LOGGINS's Wells Fargo records, it does not appear that he actually expended any funds to purchase the BMW and that AFANASYEV orchestrated LOGGINS's "purchase."  (I note that LOGGINS did not have a Citibank account, see ¶ 67 below, in 2017.)

### *2020 Maserati Levante*

64.     The Liberty Mutual claim file regarding the 2020 Maserati Levante contains a page showing Enterprise Rent-A-Car information from August 19, 2020 through September 4, 2020 listing contact information for Deshaun LOGGINS, including a Bay Area telephone number ending 1682.  The claim file also listed within the Liberty Mutual estimate of record on August 26, 2020, along with the previously mentioned e-mail address of deshaunloggins@gmail.com.  Both the 1682 telephone number and e-mail address come back to DeShaun LOGGINS on the search of the open-source database referenced above.

65.     Furthermore, LOGGINS's contact information with Citibank as of December 10, 2019 contained both the 1682 telephone number and the deshaunloggins@gmail.com e-mail address.  I have also reviewed two separate police incident reports regarding unrelated incidents that reference DeShaun LOGGINS.  One report – dated November 24, 2016 – lists LOGGINS as a suspect and provides the 1682 telephone number and the deshaunloggins@gmail.com email address.  The other report – dated December 24, 2022 – lists LOGGINS as a witness and also provides the 1682 telephone number.

66.     I submit that this information shows that Deshaun LOGGINS was the person in contact with Liberty Mutual regarding the claim submitted for the 2020 Maserati Levante.

67.     As noted above, DMV records indicate that on Deshaun LOGGINS purchased the Maserati Levante from Auto Dealership Two for $30,999 on March 9, 2020.  However, I have

reviewed records from LOGGINS's Citibank account numbered ending 4036 at around this time period.  LOGGINS's Citibank account had a balance of $241.61 on February 11, 2020.  His largest payment thereafter was on March 6, 2020 in the amount of $1,908.25 to Liberty Mutual.  There were no large payments up to April 12, 2020, where his balance was $636.33.  Accordingly, at least based on a review of LOGGINS's Citibank records, it does not appear that he actually expended any funds to purchase the Maserati and that AFANASYEV orchestrated LOGGINS's "purchase."  (I note that LOGGINS did not have a Wells Fargo account, see ¶ 63 above, in 2020.)

***Toll Analysis***

68.      In addition, to the fact that the telephone number and email address submitted with respect to the 2020 Maserati Levante fraudulent insurance claim are LOGGINS's true number and address, toll analysis regarding the 1682 telephone number shows LOGGINS's connection to AFANASYEV.

69.      In this investigation, investigators have determined that a Bay Area telephone number ending 1855 is used by AFANASYEV.  This number is now a T-Mobile number.  This 1855 number is known to be used by AFANASYEV because T-Mobile subscriber information shows 1855 is subscribed to AFANASYEV effective November 29, 2021, and "active" as of January 13, 2023.  Owner One has confirmed the 1855 number as belonging to AFANASYEV.  Open-source information also links the telephone number ending in 1855 to AFANASYEV.

70.      Toll analysis revealed 54 communication events between KIRILL AFANASYEV (1855 number) and Deshaun LOGGINS (1682 number) between August 5, 2020 and September 25, 2020.  Of the 54 communications, 40 were phone calls and 14 were text messages between AFANASYEV and LOGGINS.

71.      A review of the insurance claim made regarding the 2020 Maserati Levante is important here.  On August 9, 2020, that Maserati was reportedly involved in an accident, as set forth in  a claim filed with Liberty Mutual by Deshaun LOGGINS.  On the same day as the purported accident, KIRILL AFANASYEV (1855 number) communicated with Deshaun

LOGGINS (1682 number) three times between 20:17 and 22:03 for a total of 223 seconds.

72.     Liberty Mutual issued a check to Deshaun LOGGINS for the insurance claim regarding the Maserati.  That check was in the amount of $56,778.14 and was dated September 2, 2020.  Toll records show that, on September 3, 2020, AFANASYEV (1855 number) made two calls to LOGGINS (1682 number) between 11:36 and 11:56 totaling 315 seconds.

73.     Bank records show that LOGGINS deposited the $56,778.14 check from Liberty Mutual into his Citibank account numbered ending 4036 on September 17, 2020.  Toll records show that AFANASYEV (1855 number) and LOGGINS (1682 number) exchanged 14 consecutive text messages on the same day (September 17, 2020) between 18:39 and 19:07.

74.     Bank records also show that, on September 25, 2020, LOGGINS withdrew $63,000 from his 4036 Citibank account and obtained a cashier's check payable to the woman believed to be AFANASYEV's mother.  The same day (September 25, 2022), toll records show that LOGGINS (1682 number) called AFANASYEV (1855 number) two times between 13:29 and 14:03 for a total of 24 seconds.

<u>**Summary of Probable Cause**</u>

75.     Based on the facts set forth above regarding the purchases of, the obtaining insurance for, and the insurance claims submitted regarding the 2015 Jeep Grand Cherokee, the 2016 BMW 340, and the 2020 Maserati Levante, I submit that there is probable cause to believe that KIRILL AFANASYEV knowingly participated in, or devised, a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or concealed facts.  I submit that there is also probable cause to believe that DESHAUN LOGGINS participated in this scheme to defraud.

76.     Specifically, I submit that the facts show that AFANASYEV deliberately purchased damaged vehicles at Manheim using either Auto Dealership One or Auto Dealership Two, and then caused "sales" of those vehicles to be made to a third party (either Buyer One or LOGGINS).  Shortly before or after these purchase and sale transactions, the vehicles were registered in the names of either Buyer One or LOGGINS, but never repaired.

21

77.     I submit that the evidence shows that AFANASYEV then caused insurance policies to be taken out on the damaged vehicles.  The vehicles were insured with the insurance companies as undamaged vehicles that were in operating condition and therefore were insured at the full operating undamaged values of the vehicles.  These values were significantly higher than what the vehicles were purchased for and significantly higher than the true values of the vehicles. The evidence shows that AFANASYEV then caused insurance claims to be submitted to insurance companies.  In essence, in these claims it was represented that the damages for which insurance reimbursement was being sought occurred after the purchase of the insurance policy (when, in fact, the damage existed prior to the onset of the policy).

78.     I submit that the materiality of the misrepresentations regarding the condition of the vehicles at the time they were insured and regarding the genesis and timing of the damages to the vehicles is obvious.  Based on this, and based on my training and experience and discussions with a representative from another insurance company (Progressive Insurance), I submit that the insurance companies would not have valued these vehicles at the amounts for which the insurance claims were settled (or would not have settled the claims at all) if the companies had known that the damages identified in the various insurance claims already existed at the time the vehicles were initially insured.

79.     I also submit that these facts show that AFANASYEV and LOGGINS acted with the intent to defraud.  From start to finish, the scheme was designed to defraud insurance companies by deceiving them about the condition of the vehicles at the time they were first insured and cheating the insurance companies out of thousands of dollars that the insurance companies were not obligated to pay.

80.     Finally, I submit that the evidence shows that, in order to carry out or to attempt to carry out the scheme, AFANASYEV and LOGGINS caused mailings to be made through either the USPS or a private or commercial interstate carrier (such as FedEx or UPS).  For purposes of the requested Criminal Complaint, I submit that AFANASYEV and LOGGINS caused a mailing of a check in the amount of $56,778.14 to be made from Liberty Mutual

Insurance to LOGGINS on or shortly after September 2, 2020.

## IV.    CONCLUSION

81.    Based upon the information and facts set forth above, I submit that there is probable cause to believe that KIRILL AFANASYEV and DESHAUN LOGGINS committed the crime of mail fraud in violation of Title 18, United States Code, Section 1341 on or about September 2, 2020, in the Northern District of California when Liberty Mutual mailed a check through the United States Postal Service in the amount of $56,778.14 to LOGGINS at an address on Jamestown Avenue in San Francisco as payment for a fraudulent insurance claim submitted to Liberty Mutual by LOGGINS and AFANASYEV.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

/s/
_____
ANTHONY GHIO
Special Agent, Internal Revenue Service Criminal Investigation

Sworn to before me over the telephone and signed by me pursuant to FED. R. CRIM. P. 4.1 and 4(d) on this 23rd day of January 2023.

_____
HONORABLE THOMAS S. HIXSON
UNITED STATES MAGISTRATE JUDGE